UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

ERIN CYRKIN,
          Plaintiff,

v.

NEW YORK STATE DEPARTMENT OF LABOR,
Supervisor Barbara Weymouth,&
Manager Patricia O'Reilly,
Individually,
as Aiders and Abettors,

          Defendant (s).
_____

**COMPLAINT**

Civ. Cas. No.:

**JURY TRIAL DEMAND**

### NATURE OF THE ACTION

1.    The Plaintiff, ERIN CYRKIN,("Plaintiff"),brings this lawsuit against the Defendants, NEW YORK STATE DEPARTMENT OF LABOR ("DOL"); Supervisor Barbara Weymouth; and Manager Patricia O'Reilly, Individually as Aiders and Abettors, pursuant to the Rehabilitation Act, codified at 29 U.S.C. § 701, which expressly incorporates by reference the anti-retaliation proviso of §12203(a) of the Americans with Disabilities Act, and for violations of the New York State Human Rights Law, Executive Law § 290 *et seq.*("NYSHRL") against the Defendant, the NEW YORK STATE DEPARTMENT OF LABOR ("Defendant").

### JURISDICTION AND VENUE

2.    Jurisdiction of this court is invoked under 29 U.S.C. § 701; 28 U.S.C. §1331; and 28 U.S.C. §1343(a)(4).

3.    Venue in this District is proper as both Plaintiff and
      Defendant reside in this District. The Court has
      pendent jurisdiction over Plaintiff's state law claims.

4.    The employment practices hereinafter alleged to be
      unlawful were committed in the Western District of New
      York.

**PARTIES**

5.    The Plaintiff resides in Monroe County and had been
      employed by the Defendant since March of 1983. At all
      times relevant hereto, Plaintiff was an "employee" of
      Defendant as such term is defined in the Rehabilitation
      Act.

6.    At all times relevant hereto, Defendant DOL was, and,
      upon information and belief, is a municipal corporation
      doing business in Rochester, New York. Defendant has
      employed, and continues to employ in excess of 500
      employees.

7.    At all times relevant hereto, Defendant DOL has
      continuously engaged in an industry effecting commerce
      within the meaning of the Rehabilitation Act, and is a
      recipient of federal funding.

8.    Defendants Supervisor Barbara Weymouth, and Manager
      Patricia O'Reilly, Individually as Aiders and Abettors,
      are sued in their capacities as supervisors under the

New York State Human Rights Law, Executive Law, § 296
(6).

**FACTS**

9.  Plaintiff was hired by the Defendant DOL as an "Agency
    Services Representative" in or about March of 1983.

10. Plaintiff maintained an above average work record
    throughout the course of her employment with Defendant.

11. On May 20, 2010, Plaintiff underwent surgery to her
    thumb and wrist, which involved removing a portion of
    Plaintiff's wrist and moving the thumb in place along
    with a ligament transplant, which significantly
    impaired one or more "major life activities."

12. The "major life activities" as defined by the
    Rehabilitation Act which affected Plaintiff included
    "caring for oneself...concentrating, thinking,
    communicating and working."

13. Further, for all relevant times herein, Defendant
    regarded Plaintiff as having such an impairment under
    the Rehabilitation Act.

14. Defendant regarded Plaintiff as substantially limited
    in the major life activities enumerated above, and
    subjected her to a hostile environment because of a
    perception that Plaintiff was unable to perform her
    work duties.

15.    In or about the same time as Plaintiff underwent
       surgery, Defendant became aware of Plaintiff's
       disability because Plaintiff's husband gave Supervisor
       Barbara Weymouth ("Weymouth"), a doctor's note stating
       that Plaintiff would need voice activated software due
       to her inability to type.

16.    On September 1, 2010, Plaintiff returned to work with
       medical restrictions stating that Plaintiff could do
       limited continuous writing, 10-15 pound lifting with
       both hands, and that Plaintiff may need to take breaks
       during the day due to pain.

17.    Plaintiff had only thirty (30) percent mobility in her
       left hand and five (5) percent in her thumb.

18.    Upon her return, Plaintiff was informed that the voice
       activated software she needed was not yet available.

19.    When Plaintiff attempted to return to work after
       surgery with restrictions, Plaintiff was denied the
       opportunity to perform the essential functions of her
       job based on Defendant's perception that she was unable
       to do so.

20.    Instead, Patricia Reilly, Plaintiff's manager, told
       Plaintiff that they would "have a meeting" by the end
       of the week so they knew "what jobs Plaintiff felt she
       could do."

21.  Thereafter, on September 3, 2010, Plaintiff was
     assigned to "phones and written" for the first time in
     over a year.

22.  Plaintiff's assignment to "phones and written" included
     a great deal of computer work, in spite of her
     condition.

23.  At around 4:15 p.m. on September 3, 2010, Plaintiff
     asked Supervisor Weymouth about the assignment,
     expressing her concern that it would be too much for
     her hands and requested a new assignment.

24.  Instead of complying with Plaintiff's reasonable
     request for accommodation, Supervisor Weymouth replied
     "*maybe you should have stayed out of work longer*."

25.  When Plaintiff replied that she did not have the
     financial means to stay out of work longer, Supervisor
     Weymouth replied "*then maybe you should learn to write
     with your feet*."

26.  On September 7, 2010, Plaintiff emailed Supervisor
     Weymouth to inquire as to whether her assignment would
     be changed, to which Weymouth replied that Plaintiff
     would be on "phones and written" that morning and all
     the following day.

27.  Plaintiff then sent another email explaining that she
     had a reasonable accommodation request for voice

activated software that was pending.

28. Plaintiff also explained that being assigned to "phones and written" compromised her medical condition and caused a problem with her existing disability.

29. Plaintiff continued to suggest jobs that she could perform to no avail.

30. Supervisor Weymouth replied that she thought they should have a meeting to try to discern what office duties would be "more desirable" for Plaintiff given her condition.

31. Supervisor Weymouth asked Plaintiff to prepare a list of what duties she would feel comfortable performing.

32. On October 1, 2010, Plaintiff provided updated medical restrictions from her doctor.

33. On September 8, 2010, Plaintiff met with Manager O'Reilly, Supervisor Weymouth, and Michael Wright ("Wright"), another of Plaintiff's supervisors.

34. During the meeting, Wright badgered Plaintiff with questions about when she would feel "better", what was "wrong" with her hand and thumb, et cetera.

35. Plaintiff explained that arthritis is a permanent condition and that at the current time she had only thirty (30) percent mobility in her hand and seven (7) percent mobility in her thumb.

36. Plaintiff was then told she would be "assigned to workshops, re-employment services orientation, and job search preparation, phone with a headset, switchboard, 599 questions, resource room, faxing 599 forms and exit reports."

37. Plaintiff then called Affirmative Action Director for the Department of Labor Helen Szvoren ("Szvoren")

38. Plaintiff apprised Szvoren of her situation, who in turn agreed to go to Plaintiff's office and speak to her supervisors about the seriousness of Plaintiff's request for accommodations.

39. On October 1, 2010, Plaintiff again provided updated medical information and restrictions to Supervisor Weymouth and Manager O'Reilly.

40. Later that same day, Szvoren came to Plaintiff's office to speak to her supervisors about Plaintiff's situation.

41. On October 5, 2010, Plaintiff had a meeting with Manger O'Reilly and Supervisor Weymouth wherein she was informed her job duties would include "workshop presentations, resume review, IA and OSOS updates, 599 services from management reports, 599 exit reports and half days on phones and written."

42. On October 7, 2010, Plaintiff received an email from
    Manager O'Reilly requesting Plaintiff meet with her
    when she was available.

43. Upon meeting with Manager O'Reilly, Plaintiff was asked
    if she had taped a previous meeting with her. Plaintiff
    admitted to doing so.

44. Manager O'Reilly then admonished Plaintiff for
    recording their meeting and excused her from her
    office.

45. On October 25, 2010, Plaintiff sent the following email
    to Manager O'Reilly and Supervisor Weymouth, stating:

    > "Please be advised that I have previously
    > requested an accommodation for my known
    > disabilities, severe chronic arthritis that
    > impeded my ability to write and perform manual
    > tasks. I hereby request that you re-consider my
    > request for reasonable accommodations based upon
    > my updated restrictions from my physician. Please
    > engage in the interactive process with regard to
    > the same."

46. On October 25, 2010, Plaintiff provided updated medical
    information stating that her doctor **ordered her not to
    do computer work until the voice activated software she
    had requested arrived.**

47. Manager O'Reilly then forwarded the update to several
    other administrators.

48. Administrator Joan Pozza replied to the email, stating
    that the program had been ordered September 3, 2010,
    but was not yet received.

49.   On October 25, 2010, a meeting was held, the minutes of

      which are as follows:

           "On Monday, 10/25/10, Erin provided an updated
           medical dated 10/21/10 in which it was written
           "Can't do computer work until voice activated
           system is in." Due to scheduling we were not able
           to meet until 10/29/10 to reassess work
           duties in regard to this updated medical. During
           this meeting it was discussed the types of duties
           Erin could perform that did not involve computer
           data entry. Follow-up with the Purchase Office
           indicated that the voice activated software
           that was initially ordered is obsolete. Purchase
           updated the software order and requested that the
           order be expedited. The duties that were discussed
           and agreed upon that Erin can do with in her
           physical restrictions are:

           Job Search Prep Workshop and Preparation Group
           Orientation/RSO and Preparation Office will adjust
           the scheduling of these workshops to ana AM and PM
           session Traffic Control; Greeter Mock Interviews.
           Will shadow Mock Interviews to become familiar
           with the process UI Questions, staff will refer
           customer's to Erin Assist customers as needed with
           completing UI forms if customers come to office.
           Assist customers in the Resource Room who are
           working to file a UI Claim or need to complete
           form. Will talk customers through the on line
           process Become familiar with Resource Room
           activity and Computer Sites, where can talk
           customer through the various sites Shadow RR so
           that can be put in the assignment as needed. In
           addition each of us, including Michael Wright,
           would be thinking about additional duties that
           Erin can do.

50.   On December 17, 2010, Plaintiff interviewed for the

      position of Employment Services Representative

      position, which would have been a promotion.

51.   Plaintiff learned upon arriving at the interview that

      one of the panel members that would be interviewing her

      was Manager O'Reilly.

52.  Less than two weeks after her interview, Plaintiff received a letter indicating she was no longer being considered for promotion.

53.  On January 5, 2011, the voice activated software finally arrived.

54.  Plaintiff was excited and relieved, *until* a staff member from information technology informed her that the software was not compatible with the OSOS computer program utilized by the DOL.

55.  Plaintiff was then told by Manager O'Reilly to "figure out a way to get it to work with our program."

56.  Plaintiff, although confused and upset, made an effort to make the software work with the office computer system.

57.  On January 7, 2011, Plaintiff was sitting at the desk of a co-worker when Wright approached her and told her co-worker that a 599 meeting would be starting shortly.

58.  Plaintiff commented that she did not know there was a meeting scheduled, to which Wright replied "I guess you can come."

59.  Plaintiff was never informed by Manager O'Reilly of the meeting.

60.  At 11:43 A. M. Plaintiff emailed Weymouth and Wright telling them that the way in which her request for

accommodations has been a humiliating and trying experience, and that she felt as though she was being treated in a discriminatory fashion because of her disability.

61.  In their meeting to discuss the email from Plaintiff, Plaintiff was told that she could write job orders "*if she could figure out how to use the software*."

62.  On or about January 18, 2011, Plaintiff went out on medical leave.

63.  On or about August 2011, Plaintiff's doctor wrote a medical report stating that Plaintiff would be able to return to work on January 3, 2012, which was faxed to Defendant in Albany.

64.  Pursuant to her doctor's orders, Plaintiff returned to work in the Job Bank Division with a restriction stating that Plaintiff was not to have public contact.

65.  Upon information and belief, employees of the Job Bank Division do not have public contact as part of their regular work assignments.

66.  Upon her return, Plaintiff waited over an hour for a supervisor to give her a work assignment.

67.  Supervisor Weymouth informed Plaintiff that she should contact Personnel Administrator Alejandra Stein ("Stein").

68.  Stein stated that she had received Plaintiff's medical restrictions and that "*since your medical stated that you should avoid public contact, and since that is a large part of your job, you need to leave immediately.*"

69.  When Plaintiff told Stein that nobody in the Job Banks Division had public contact, Stein stated "take it up with the Division of Equal Opportunity Development."

70.  By its conduct as set forth above, Defendant has engaged in unlawful employment practices in violation of the Rehabilitation Act at their Rochester, New York facility.

71.  These practices include without limitation, refusing to provide Plaintiff with reasonable accommodations for her disability, and retaliating against her for seeking reasonable accommodations as result of her disability and Defendant's perception thereof.

72.  These unlawful practices were intentional on the part of Defendant and its management.

73.  These practices have caused Plaintiff damages, deprived Plaintiff of equal employment opportunities and otherwise adversely affected Plaintiff because of her disability.

## FIRST CAUSE OF ACTION

### VIOLATION OF THE REHABILITATION ACT

74.  The above stated paragraphs are incorporated by
     reference as if fully set forth herein.

75.  The Defendant is a recipient of federal financial
     assistance, thereby qualifying as an employer for the
     purposes of the Rehabilitation Act.

76.  By its conduct as set forth above, Defendant has
     engaged in unlawful employment practices in violation
     of the Rehabilitation Act, at their Rochester, New York
     facility.

77.  These practices include without limitation, refusing to
     provide Plaintiff with reasonable accommodations for
     her known disabilities, retaliating against her for
     seeking reasonable accommodations as a result of her
     disability and/or perceived disability.

78.  These unlawful practices were intentional on the part
     of the Defendant, and its management.

79.  These practices have caused Plaintiff damages, deprived
     Plaintiff of equal employment opportunities and
     otherwise adversely affected Plaintiff because of her
     disability.

## SECOND CAUSE OF ACTION

### RETALIATION UNDER THE REHABILITATION ACT

80.  Plaintiff incorporates the above stated paragraphs as
     though they were fully stated herein.

81.  The Rehabilitation Act, 29 U.S.C. § 794a(2), expressly
     incorporates Title VI's provisions, including the anti-
     retaliation regulation, 34 C.F.R. 100. 7 (e).

82.  Plaintiff need not be disabled to have standing to
     invoke the anti-retaliation provisos of the
     Rehabilitation Act; further, as stated above, Defendant
     is a recipient of federal funding and is a qualified
     employer under the Act.

83.  Plaintiff engaged in protected activity under the
     Rehabilitation Act when she requested that the
     Defendants engage in the interactive process.

84.  Shortly thereafter, Plaintiff was subject to
     retaliation in the work place as a result of advocating
     for her rights under the Rehabilitation Act that would
     dissuade a reasonable person from making a further
     complaint of discrimination in the workplace. In
     particular, Plaintiff was subject to the following
     retaliatory actions that were causally related to her
     engaging in protected activity under the Rehabilitation
     Act as set forth above in ¶¶ 45-71.

85.   Defendant cannot demonstrate that it would have taken any of the aforementioned retaliatory actions taken in response to Plaintiff engaging in protected activity under the Rehabilitation Act.

86.   Defendant had no legitimate business reason for these actions.

87.   As a direct and proximate result of Defendants' willful, knowing and intentional discrimination against her, Plaintiff has suffered and will continue to suffer severe mental anguish and emotional anguish and emotional distress; she has incurred and will continue to incur medical expenses for treatment by health care professionals, and for other incidental expenses, and he has suffered and will continue to suffer a loss of earnings and other employment benefits and job opportunities. Plaintiff is thereby entitled to general and compensatory damages in amounts to be proven at trial.

88.   As a further and proximate result of Defendants' violations of the Rehabilitation Act, Plaintiff has been compelled to retain the services of counsel in an effort to enforce the terms and conditions of the employment relationship with Defendants and each of them, and has thereby incurred and will continue to

incur, legal fees and costs, the full nature and extent

of which are presently unknown to the Plaintiff.

Plaintiff requests that attorney fees be awarded.

89. Defendants' conduct as described herein was malicious

and oppressive, and done with a conscious disregard of

Plaintiffs rights.  The acts were performed with the

knowledge of defendants' economic power over Plaintiff.

Defendant ratified the unlawful conduct of its

employees in this action.  Consequently, Plaintiff is

entitled to punitive or exemplary damages from all

Defendants.

### THIRD CAUSE OF ACTION

### VIOLATION OF THE NEW YORK STATE HUMAN RIGHTS LAW, EXECUTIVE LAW § 290 et seq. (ALL DEFENDANTS)

90. The above stated paragraphs are incorporated by

reference as if fully set forth herein.

91. By its conduct as set forth above, Defendant has

engaged in unlawful employment practices in violation

of the New York State Human Rights Law, Executive Law,

§ 290 *et seq*., at their Rochester, New York facility.

92. These practices include without limitation, refusing to

provide Plaintiff with reasonable accommodations for

his disability, retaliating against her for seeking

reasonable accommodations and terminating her

employment as a result of her disability and/or perceived disability.

93.   These unlawful practices were intentionally on the part of the Defendant and its management.

94.   These practices have caused plaintiff damages, deprived Plaintiff of equal employment opportunities and otherwise adversely affected Plaintiff because of her disability.

**WHEREFORE,** Plaintiff respectfully claims the following relief:

1.   That this court assume jurisdiction over this action;

2.   Judgement in favor of Plaintiff for back pay and the value of lost employment benefits as may be found by a jury;

3.   Judgement in favor of Plaintiff for compensatory damages;

4.   An award for reasonable attorney's fees and costs; and

5.   Such other and further relief as this court may deem just, equitable and proper.

Dated: February 22, 2013
Rochester, New York


By:          *CHRISTINA A. AGOLA, PLLC*

             */s/ Christina A. Agola, Esq.*
      By:    _____
             Christina A. Agola, Esq.

             *1415 Monroe Avenue*
             *Rochester, New York 14618*
             *585.262.3320*
             *cagola@wnycivilrights.com*

             *Attorneys for Plaintiff*

             *ERIN CYRKIN*